AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)      ☐ Original   ☐ Duplicate Original

**LODGED**
CLERK, U.S. DISTRICT COURT
04/03/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ GSA _____ DEPTUTY

**FILED**
CLERK, U.S. DISTRICT COURT
4/3/2026
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ VV _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America,

v.

Halil Boughazi,

Defendant

Case No.    2:26-mj-01957-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of April 2, 2026, in the county of Los Angeles in the Central District of California, the

defendant violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. § 1029(a)(2) | Use of Unauthorized Access Devices |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/
*Complainant's signature*

Trevor West, HSI Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   April 3, 2026

*Judge's signature*

City and state:   Los Angeles, California

The Hon. Maria A. Audero, U.S. Magistrate Judge
*Printed name and title*

AUSA: Monika Hara (x3519)

**AFFIDAVIT**

I, Trevor West being duly sworn, declare and state as follows:

## I.  PURPOSE OF AFFIDAVIT

1.    This affidavit is made in support of a criminal complaint against Halil BOUGHAZI for a violation of 18 U.S.C. § 1029(a)(2) (use of unauthorized access devices).

2.    This affidavit is also made in support of an application for a warrant to search a blue iPhone seized from Halil BOUGHAZI on April 2, 2026 (the "SUBJECT DEVICE") and currently in the custody of Homeland Security Investigations ("HSI"), in Paramount, CA, and described in Attachment A.

3.    The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 18 U.S.C. §§ 371 (Conspiracy), 1028A (Aggravated Identity Theft), 1029 (Access Device Fraud), and 1344 (Bank Fraud) (collectively, the "Subject Offenses"), as described more fully in Attachment B.  Attachments A and B are incorporated herein by reference.

4.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and search warrant, and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and

statements described in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

5.    I have been a sworn police officer with the Culver City Police Department for approximately six years.  I am currently assigned as a Task Force Officer with the Homeland Security El Camino Real Financial Crimes Task Force.  I am also assigned to the Culver City Police Department's Emergency Response Team.  Prior to that, I was a Crime Impact Team Detective, Field Training Officer, and assigned as a Mobil Field Force Officer.

6.    I am a graduate of the P.O.S.T. Certified Police Academy, which covered basic police fundamentals, including laws of arrest, search and seizure, weapons laws, crimes against persons investigations, property crime investigations, drug laws and identification, criminal and civil court process, crime scene investigation, etc.

7.    Since becoming a Police Officer I have participated in over 1,000 investigations related to crimes against persons and property crimes including forgery, theft, assault, burglary, and robbery.  During my tenure as a Crime Impact Detective, I have participated in approximately 500 investigations including conducting surveillance of wanted suspects, interviewing victims, witnesses, and suspects, evidence collection, crime scene preservation which ultimately lead to the arrest of those responsible for such crimes.

8.    I attended California State University Northridge in Northridge, California, and received a Bachelor of Science degree in Business Administration: Systems and Operations Management.  I also hold  an Advanced Peace Officer Standards and Training (P.O.S.T) Certificate from the State of California. I have maintained knowledge through legal updates, briefing topics, training bulletins, books and videos covering a vast amount of law enforcement related issues.  I also regularly consult with other detectives in various fields of police work and investigations.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

9.    Between January 2025 and January 2026, the California Department of Social Services ("DSS") has detected more than $60.9 million in stolen funds from victim Electronic Benefit Transfer ("EBT") cards.  This fraud is from two specific programs known as CalFresh and CalWORKs, which help low-income households pay for housing, food, and other necessary expenses. Many of the fraudulent withdrawals are done at specific ATMs in the Central District of California.

10.   On or about April 2, 2026, beginning at approximately 6:00 a.m., law enforcement began receiving information from a U.S. Bank branch located at 4350 Pacific Coast Highway, Torrance, CA 90505-5528 (the "Target Bank"), which was identified by DSS data as an ATM location with suspected EBT fraud.

11.   Law enforcement was alerted to potential fraudulent withdrawals from California EBT BIN numbers at the Target Bank.

3

On April 2, 2026, from 6:03 a.m. to 7:12 a.m., at the Target Bank, BOUGHAZI used gift cards encoded with the EBT stripe data of California EBT funds to successfully withdraw $9,000 in cash. BOUGHAZI also conducted balance inquires using 59 different EBT cards.

12. At approximately 7:15 a.m., law enforcement responded to the Target Bank and observed BOUGHAZI at an ATM terminal. Upon observing law enforcement BOUGHAZI proceeded to flee from law enforcement on foot, at which point a foot pursuit ensued. BOUGHAZI was eventually detained at 4445 Pacific Coast Highway Torrance, CA 90505 and found with approximately 73 access devices that were later determined to be cloned California EBT cards. BOUGHAZI was arrested and found in possession of approximately 73 cloned EBT access cards, $3,460 in cash, and the SUBJECT DEVICE.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

13. Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A. Regulatory Background of CalFresh and CalWORKs Programs**

14. DSS is a government agency that administers several benefit and assistance programs for residents of the state of California. One of the assistance programs administered by DSS is called CalFresh (formerly known as food stamps), which helps low-income households purchase food and household items to meet their nutritional needs. Another assistance program administered

4

by DSS is called CalWORKs, which helps low-income families with children pay for housing, food, and other necessary expenses.

15. Residents of California that meet the criteria established by the CalFresh or CalWORKs programs can apply online for benefits at www.getcalfresh.org and www.benefitscal.com. Beneficiaries apply for benefits by submitting their income and number of dependents to determine their benefit eligibility.

16. CalFresh and CalWORKs benefits are issued through Electronic Benefit Transfer cards ("EBT cards"). EBT cards are mailed to an address designated by the account holder and function like traditional debit cards to conduct transactions. For example, you can use an EBT card to make a purchase at a grocery or convenience store by swiping the card at a point-of-sale terminal.

17. The EBT cards issued under CalFresh and CalWORKs are assigned specific Bank Identification Numbers ("BIN"). A BIN refers to the first five or six digits of the account number on a debit or credit card and can be used to identify the issuer of the card, like DSS, which administers the CalFresh and CalWORKs programs.

18. Benefits received through the program are typically disbursed to EBT cardholders by DSS during the early days of each month. Those benefits are deposited directly from DSS into the account of the EBT cardholder.

19. The EBT cardholders can then conduct cash withdrawals at ATMs using a personal identification number ("PIN")

5

established by the card holder. The EBT cardholder presents the card at an ATM, inserts the card into the ATM card reader, and utilizes a PIN to withdraw the funds previously deposited by DSS intended for beneficiaries of the CalFresh or CalWORKs programs.

**B.    Background on EBT Fraud in the Los Angeles Area and Prior State and Federal Operations**

20. Since in or about August 2022, local law enforcement has been working with DSS to investigate a significant increase in unauthorized cash withdrawals utilizing EBT cards. Based on analysis of victim complaints to DSS, victim complaints to local law enforcement, bank records, and surveillance, law enforcement determined that the majority of the unauthorized cash withdrawals were being conducted with cloned cards.

21. A cloned card can be a blank white plastic card or another debit, credit, or gift card that contains altered information on the card's magnetic stripe.  Based on my training and experience, I know that suspects will often clone cards by taking stolen card information from a victim card's magnetic stripe and re-encode that stolen information onto another card's magnetic stripe.  Cloning these cards allows the suspect to use the card and the DSS benefits added on to the account linked to the card for illicit purchases or unauthorized cash withdrawals.

22. On a legitimate debit or credit card, the information contained on the card's magnetic stripe will match the information embossed on the front of the card. This information includes the account number, expiration date, and cardholder's name, among other information. Whereas on a cloned card, the

information contained on the magnetic stripe will not match the information embossed on the front of the card. For example, if a suspect re-encodes victim EBT card information onto a pre-existing gift card's magnetic stripe or a blank white plastic card with a magnetic stripe, the magnetic stripe will be encoded with the EBT card information, but the card itself will still bear the embossed information of the gift card or bear no information if it is a blank white plastic card.

23. Based on my training, experience, and participation in this investigation, I know that the victim card data harvested to clone cards is often obtained from what is colloquially referred to as "skimming activity."

24. The term "skimming" is used to describe activity that involves unlawfully obtaining debit and credit card information by using technological devices to surreptitiously record victim accountholders' debit and credit card numbers and PIN at, for example, ATMs or point-of-sale terminals. For example, individuals conducting ATM "skimming" may install a skimming device into the card reader of the ATM to record the debit or credit card numbers, as well as a camera or keypad overlay on the ATM keypad to record the associated PIN number. Those individuals will then return to the ATM to collect the card number and PIN information stored on the installed device.

25. As described above, suspects then manufacture cloned and fraudulent debit or credit cards that bear the victim account holder's account information that was obtained from skimming. Once that information is loaded onto another

7

fraudulent card (e.g., a gift card or blank plastic card), members of the scheme then use that fraudulent card to withdraw cash from the victim accountholder's bank accounts or to make purchases with the victim accountholder's account.

26. In or about September 2022, local law enforcement conducted a surveillance and arrest operation in the Los Angeles, California area. This operation was planned in response to the large number of unauthorized withdrawals occurring at ATMs in the Los Angeles area during a short period of time. Specifically, law enforcement had analyzed fraudulent EBT withdrawal data and noticed a high volume of unauthorized withdrawals on specific dates and times that coincided with the dates when the majority of benefits are disbursed to EBT cardholders.

27. As a result of this operation, local law enforcement established surveillance at select ATMs that were used to conduct a significant volume of EBT fraud. Law enforcement surveilled those ATMs around the dates when benefits had been disbursed, observed suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession, and arrested multiple individuals believed to be making fraudulent withdrawals of EBT benefits. As a result, law enforcement arrested approximately 16 suspects. All of the arrested suspects were later determined to be citizens of countries other than the United States who did not have documentation to be lawfully present in the United States. All of the individuals arrested were released from local custody

8

within hours of their arrest and absconded from any future judicial proceedings.

28.  In or about February 2023, in response to a further increase in unauthorized cash withdrawals utilizing EBT cards after the local law enforcement September 2022 operation, federal law enforcement conducted a similar surveillance and arrest operation in the Los Angeles, California area. Law enforcement established surveillance around the dates when benefits had been disbursed at select high-volume EBT fraud ATMs. Law enforcement arrested three suspects that withdrew a high volume of unauthorized withdrawals and that conducted those withdrawals in rapid succession.  Two of those defendants came to the ATM together, possessed 35 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that they had made more than $190,000 in past attempted fraudulent EBT withdrawals from a single bank since October 2022.  One additional defendant possessed 269 cloned EBT cards at the time of arrest, and later analysis of historic ATM surveillance data showed that the defendant had made more than $70,000 in past attempted fraudulent EBT withdrawals from a single bank since January 2023.  All three of these defendants were determined to be citizens of Romania, who did not have documentation to be lawfully present in the United States.  The three arrested defendants were ordered detained pending trial by the Hon. Karen Stevenson and Hon. Margo A. Rocconi.  A federal grand jury returned two indictments against the three defendants for bank fraud, in violation of 18 U.S.C. § 1344; aggravated

identity theft, in violation of 18 U.S.C. § 1028A; use of unauthorized access devices, in violation 18 U.S.C. § 1029(a)(2); and possession of unauthorized access devices, in violation of 18 U.S.C. § 1029(a)(3), in 23-CR-0076-FLA and 23-CR-0077-JFW.

29. From March 2025 through September 2025, federal law enforcement conducted multiple surveillance and arrest operations in the Los Angeles, California area. Law enforcement arrested approximately 39 suspects that conducted unauthorized EBT transactions. At the time of their arrest, the suspects had in their possession cloned EBT cards, cash in illicitly obtained funds, and multiple skimming devices. 34 out of the 39 defendants were determined to be citizens of other countries, of which 28 were Romanian citizens, the majority did not have documentation to be lawfully present in the United States.

C.    **Background of Current Operation to Combat EBT Fraud**

30. The most current data provided by DSS, based in part upon reported fraud by victims, indicates that between January 2025 and January 2026, more than approximately $60.9 million in cash benefits has been stolen from victim EBT cards throughout California.

31. Of the more than approximately $60.9 million in cash benefits stolen during this year time period, more than approximately $30.6 million has been stolen from victim EBT cards, in the county of Los Angeles alone. The majority of these funds were stolen through unauthorized ATM withdrawals.

10

32.  In the month of January 2026, according to data from DSS, more than approximately $3.7 million was stolen from victim EBT cards largely through unauthorized ATM withdrawals.  Of the approximately $3.7 million stolen from victim EBT cards in the month of January 2026, more than approximately $2.1 million was stolen, mostly through unauthorized ATM withdrawals, in Los Angeles County alone.

33.  Based upon my training and experience conducting access device fraud investigations, I know that suspects committing access device fraud schemes will often target particular BINs when harvesting stolen card information collected from skimming devices.  Thus, suspects using skimming devices may target the BIN associated with DSS, in essence, targeting CalFresh and CalWORKs benefits.  Moreover, based upon my training and experience, the sheer volume of unauthorized ATM withdrawals occurring during the early days of the month is further indicative that suspects participating in the fraud scheme at issue are targeting EBT cards because benefits are typically disbursed to EBT cardholders during the early days of each month.

34.  Law enforcement has also reviewed ATM surveillance provided by financial institutions that administer EBT accounts that relate to the fraud scheme at issue.  During the unauthorized ATM withdrawals, suspects can often be seen holding stacks of cards and conducting withdrawals in quick succession at one ATM.  Based upon my training and experience, I know that suspects perpetrating access device fraud schemes will often

11

conduct unauthorized withdrawals using cloned cards in rapid succession at ATMs.

35. Based upon the rapid succession of unauthorized ATM withdrawals being conducted, the fact that the cards being used to conduct the unauthorized cash withdrawals are nearly all cloned EBT cards, and the fact that nearly all of the unauthorized withdrawals are happening during the early days of the month, I believe that suspects participating in the fraud scheme at issue are ostensibly targeting EBT cards.

D.    **BOUGHAZI Committed EBT Fraud Using Unauthorized Access Devices on April 2, 2026 and Fled from Police**

36. Based upon the large dollar amount being stolen from victim EBT cards, the number of victims impacted, the concentration of unauthorized ATM withdrawals occurring in particular areas, and the large number of unauthorized ATM withdrawals occurring at singular bank locations, law enforcement decided to conduct a surveillance and arrest operation in April 2026.

37. Based upon my training and experience, I know that as an anti-fraud measure, Cal DSS places an embargo on EBT accounts, such that EBT cardholders are not able to conduct cash withdrawals from their EBT cards from approximately 12:00 a.m. to 6:00 a.m., on the morning that their funds load (i.e., the 1st, 2nd, or 3rd of the month, depending on the account).

38. On or about April 2, 2026, starting at approximately 6:03 a.m., based on information from U.S. Bank, law enforcement

was alerted to potential withdrawals from California EBT BIN numbers.

39.  At approximately 7:15 a.m., Torrance Police Department responded to the Target Bank and saw BOUGHAZI at an ATM terminal.  From my review of reports and discussion with law enforcement witnesses, I know that upon observing law enforcement, BOUGHAZI fled on foot, at which point a foot pursuit ensued.  BOUGHAZI was eventually detained at 4445 Pacific Coast Highway Torrance, CA 90505 and found with approximately 73 access devices.  These devices were later determined to be cloned California EBT cards.  BOUGHAZI was arrested and found in possession of approximately 73 cloned EBT access cards, $3,460 in cash, and the SUBJECT DEVICE.

40.  Based on logs provided by U.S. Bank, during the time when BOUGHAZI was at the ATM, there were nine withdrawals involving an EBT card number – which matched the EBT card numbers encoded on cloned cards seized from BOUGHAZI incident to his arrest.  Those transactions totaled $9,000 in financial loss.  U.S. Bank provided photographs of BOUGHAZI from the ATM during the fraudulent transactions.

41.  On his person, BOUGHAZI had approximately $3,460 found in his front right jacket pocket, the SUBJECT DEVICE found in his front left jacket pocket, and 73 access cards found in his front right jacket pocket.  The access devices, pictured below, had stickers placed on them with what appeared to be, based on my training and experience, victim PINs.



42.  Law enforcement officers and analysts analyzed the magnetic stripes of the 73 access devices mentioned above and determined that all the access devices were encoded with California EBT BINs.  Moreover, the cloned cards also were affixed with stickers bearing victim PINs, some of which corresponded with the recovered cloned cards, and which were needed in order to conduct the unauthorized ATM withdrawal.

43.  The SUBJECT DEVICE was secured and transported to the HSI location in Paramount, CA where the device is securely held pending issuance of a search warrant.

44.  Based on the date, time, ATM location, presence of successive ATM transactions on an EBT cardholder accounts, and

law enforcement's previous review of records showing BOUGHAZI withdrawing from EBT card numbers, as discussed below, BOUGHAZI was detained in order to investigate further.

45. Law enforcement searched for BOUGHAZI in U.S. Immigration and Customs Enforcement databases and learned he was a French citizen, and he had valid status through Electronic System for Travel Authorization (ESTA) in the United States that expires in 2028.

**E.    BOUGHAZI HAS COMMITTED OVER $100,000 IN EBT FRAUD ON PRIOR OCCASIONS**

46. Based on information received from the U.S. Secret Service and their review of ATM video and transaction records obtained from U.S. Bank, BOUGHAZI was observed at the following U.S. Bank locations in the Los Angeles area withdrawing funds from EBT card numbers between December 1, 2025, and April 1, 2026. The total combined amount withdrawn was approximately $132,260, utilizing approximately 155 California EBT cards:

a.    On December 1, 2025, BOUGHAZI was observed on U.S. Bank ATM video records at the Target Bank between approximately 6:01 to 7:09 a.m. During this time period, U.S. Bank transaction data showed withdrawals totaling approximately $24,060 from 24 unique California EBT cards.

b.    On December 2, 2025, BOUGHAZI was observed on U.S. Bank ATM video records at the Target Bank between approximately 6:13 to 7:12 a.m. During this time period, U.S. Bank transaction data showed withdrawals totaling approximately $17,200 from 22 unique California EBT cards.

15

c. On February 3, 2026, BOUGHAZI was observed on U.S. Bank ATM video records at the U.S. Bank located at 710 W Olympic Boulevard Los Angeles, CA 90015 between approximately 6:04 to 8:42 a.m. During this time period, U.S. Bank transaction data showed withdrawals totaling approximately $36,200 from 45 unique California EBT cards.

d. On March 2, 2026, BOUGHAZI was observed on U.S. Bank ATM video records at the U.S. Bank located at 1702 North Vermont Avenue Los Angeles, CA 90027 location between approximately 6:12 to 7:59 a.m. During this time period, U.S. Bank transaction data showed withdrawals totaling approximately $27,520 from 30 unique California EBT cards.

e. On April 1, 2026, BOUGHAZI was observed on U.S. Bank ATM still records at the U.S. Bank located at 1702 North Vermont Avenue Los Angeles, CA 90027 between approximately 6:11 to 8:54 a.m. During this time period, U.S. Bank transaction data showed withdrawals totaling approximately $27,280 from 34 unique California EBT cards.

## V. TRAINING AND EXPERIENCE REGARDING IDENTITY THEFT CRIMES

47. Based on my training and experience and information obtained from other law enforcement officers who investigate identity theft, I know the following:

a. It is common practice for individuals involved in identity theft, bank fraud, and access device fraud crimes to possess and use multiple digital devices at once. Such digital devices are often used to facilitate, conduct, and track fraudulent transactions and identity theft. Suspects often use

16

digital devices to perpetrate their crimes due to the relative anonymity gained by conducting financial transactions electronically or over the internet. They often employ digital devices for the purposes, among others, of: (1) applying online for fraudulent credit cards; (2) obtaining or storing personal identification information for the purpose of establishing or modifying fraudulent bank accounts and/or credit card accounts; (3) using fraudulently obtained bank accounts and/or credit card accounts to make purchases, sometimes of further personal information; (4) keeping records of their crimes; (5) researching personal information, such as social security numbers and dates of birth, for potential identity theft victims; and (6) verifying the status of stolen access devices.

b.    Oftentimes identity thieves take pictures of items reflecting their stolen identities, including items retrieved from stolen mail or mail matter, with their cellphones.

c.    It is also common for identity thieves to keep "profiles" of victims on digital devices.  Such "profiles" contain the personal identifying information of victims, such as names, Social Security numbers, dates of birth, driver's license or state identification numbers, alien registration numbers, passport numbers, and employer or taxpayer identification numbers.  Identity thieves often keep such information in their cars, storage units, and in their digital devices.

d.    It is common for identity thieves, and individuals engaged in bank fraud, access device fraud, and

17

identification document fraud to use equipment and software to print credit and identification cards, to create magnetic strips for credit cards, to use embossing machines to create credit cards, to use laser printers to create checks, and to use magnetic card readers to read and re-encode credit cards.  These types of devices are routinely kept where the person will have easy access to such devices, such as on their person or in their cars or homes or storage units.  Software relevant to such schemes can also often be found on digital devices, such as computers.

e.   Based on my training and experience, I know that individuals who participate in identity theft, bank fraud, and access device fraud schemes often have co-conspirators, and often maintain telephone numbers, email addresses, and other contact information and communications involving their co-conspirators in order to conduct their business.  Oftentimes, they do so on their digital devices.  Suspects often use their digital devices to communicate with co-conspirators by phone, text, email, and social media, including sending photos.

## VI. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

48.  As used herein, the term "digital device" includes the SUBJECT DEVICE.

49.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and

19

who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

50.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

20

51.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    The person who is in possession of a device or has the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

21

appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BOUGHAZI's thumb and/or fingers on the device; and (2) hold the device in front of Halil BOUGHAZI's face with his eyes open to activate the facial-, iris-, and/or retina-recognition feature.

52.   Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII.  **CONCLUSION**

53.   For all of the reasons described above, there is probable cause to believe that BOUGHAZI committed a violation of 18 U.S.C. § 1029(a)(2) (use of unauthorized access devices). There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICE as described in Attachment A.

Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone on
this 3rd day of April, 2026.

_____
THE HONORABLE MARIA A. AUDERO
UNITED STATES MAGISTRATE JUDGE